

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE NOV 2 2 2017
Fairhurst. CJ.
CHIEF JUSTICE

This opinion was filed for record

at 8:00am on Nov 22, 2017

_____ Deputy
for SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 93923-3 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| JOHN GARRETT SMITH, | ) | |
| | ) | |
| Respondent. | ) | Filed     NOV 2 2 2017 |
| | ) | |

MADSEN, J.—This case concerns application of RCW 9.73.030 of the Washington privacy act to an inadvertent recording on a cell phone voice mail of a domestic violence assault. We hold that the recording here does not contain a "conversation" within the meaning of the privacy act. Further, even if the recorded verbal exchange here could be considered a private conversation within the privacy act, nevertheless an exception contained in the privacy act applies, rendering the recording admissible. We reverse the Court of Appeals to the extent it holds otherwise.

## FACTS

John Garrett Smith and Sheryl Smith were married in 2011. On the evening of June 2, 2013, the Smiths engaged in an argument at their home that turned violent. Mr. Smith punched and strangled Mrs. Smith to the point of unconsciousness and then left

their home. When Mrs. Smith regained consciousness, her eyes were black and swollen shut, her face was swollen and bleeding, and she had difficulty breathing.[1] Mrs. Smith was hospitalized for several days due to the severity of her injuries, which included a facial fracture and a concussion. For months after the assault, she suffered severe head pain, double vision, nausea, and vertigo.

Mrs. Smith's memory of the attack at the time of trial was limited; she recalled:

I'm being strangled. Garrett's on top of me. My face is being punched. I feel like I'm in a very dark place inside of my head, and three punches, and I'm being called a fat bitch, and I thought I was going to die.

2A Verbatim Report of Proceedings (VRP) at 238. Other evidence filled in Mrs. Smith's memory gaps, including her written statement, which was read into the record. Additionally, there was a recording made of the incident. During the incident, Mr. Smith used the home's landline cordless phone to dial his cell phone in an attempt to locate the cell phone. The cell phone's voice mail system recorded the incident because Mr. Smith left the landline open during his attempt to find his cell phone. This voice mail contained sounds of a woman screaming, a male claiming the woman brought the assault on herself, more screams from the female, name calling by the male, and the following exchange:

MALE: There, are you happy now?

(Woman screaming.)

MALE: You brought this shit on. I have never done this. You and your fucking Mexican. Fuckcocking three-timer. You're not going to get your (inaudible) three check.

---

[1] Photographs of Mrs. Smith's injuries that were taken on the night of the attack were later admitted into evidence at Mr. Smith's trial.

. . . .

WOMAN: Get away.

MALE: No way. I will kill you.

WOMAN: I know.

[More female screaming and name calling by the male followed until the recording ended.]

2A VRP at 241-43; 1 VRP at 70-71; Ex. 2; Clerk's Papers (CP) at 78-80.[2] At trial, the female in the recording was identified as Sheryl Smith and the male as the defendant, John Garrett Smith. Mr. Smith fled the scene without his cell phone after strangling Mrs. Smith to unconsciousness. The cell phone ended up in the possession of Skylar Williams, Mrs. Smith's daughter and Mr. Smith's stepdaughter, after Ms. Williams returned to the house and helped her mother complete a 911 call.

On the 911 call, Mrs. Smith can be heard gasping and pleading for help. She reported being unable to see. Mrs. Smith explained to the 911 operator that she had been "beat to a pulp" by John Garrett Smith. 2A VRP at 188. Ms. Williams, who had just arrived home, then grabbed the phone and told the 911 operator that her mother's face is "like ten times the size of normal and gushing blood" and that "she can't open her eyes because her face is so swollen." 2A VRP at 190. Following the arrival of the police and paramedics, Mrs. Smith received medical care and was transferred to a hospital.

---

[2] Multiple transcripts of the recording were admitted. Each transcript of the recording is slightly different.

While at the hospital, Ms. Williams looked at Mr. Smith's cell phone and saw a missed call and a voice mail from the family landline left around the time of the incident. She listened to the voice mail and then played it for an officer. The police, after hearing the voice mail, seized the cell phone and executed a search warrant on it. While at the hospital, Ms. Williams received multiple calls from Mr. Smith. During one of those calls, Mr. Smith indicated that he thought he should book a flight and leave town. Ms. Williams told him to meet her at the house instead, but her plan was to send the police to meet Mr. Smith.

The police arrested Mr. Smith at the home. At that time, he denied any physical altercation with Mrs. Smith. But the next morning, Mr. Smith asked a detective, "Is she going to make it?" despite not receiving any information from the detective about Mrs. Smith's injuries. 2C VRP at 636.

The State charged Mr. Smith with attempted first degree murder, attempted second degree murder, first degree assault, and second degree assault for the incident occurring with Mrs. Smith on June 2, 2013. Prior to trial, Mr. Smith filed a motion to suppress the audio recording found on his cell phone that captured part of the incident, including him threatening to kill his wife. Mr. Smith argued that Ms. Williams had unlawfully intercepted the recording pursuant to the privacy act, RCW 9.73.030, when she listened to the voice message left on his phone. The trial court denied the motion to suppress, ruling that Ms. Williams's conduct did not constitute an interception. The court also ruled that RCW 9.73.030(1)(b), which, as discussed below, prohibits the recording of private conversations without consent, did not apply because the information was

4

inadvertently recorded, noting that "[a]t the time this information was recorded, nobody was trying to intercept or record what was occurring." CP at 92 (Conclusion of Law 9).

The case proceeded to a bench trial. The trial court found Mr. Smith guilty of attempted second degree murder, second degree assault, and the related special allegations of domestic violence, but acquitted him of the remaining counts and the aggravator. Mr. Smith was sentenced to a standard range sentence of 144 months. He appealed, and his appellate argument focused on the denial of the motion to suppress; he continued to assert that the recording was unlawfully admitted because Ms. Williams had unlawfully intercepted it.

The Court of Appeals reversed Mr. Smith's conviction for attempted second degree murder, holding that the trial court erred in denying the motion to suppress the recording of the incident because (1) the recording was of a "private conversation" and (2) *Mr. Smith* (the *defendant*) had unlawfully recorded the "private conversation," despite the fact that the recording was made inadvertently. *State v. Smith*, 196 Wn. App. 224, 227, 237-38, 382 P.3d 721 (2016) (*John Garrett Smith*). The Court of Appeals rejected Mr. Smith's assertion that Ms. Williams had unlawfully intercepted the conversation, and decided the case on a different issue, that is, whether Mr. Smith's actions violated the privacy act. *Id.* at 236. The State sought and this court granted review on the issue of how the privacy act is to be properly applied in this case. *State v. Smith*, 187 Wn.2d 1025, 391 P.3d 447 (2017). Accordingly, the issue before this court is whether the voice mail recording is admissible in John Garrett Smith's criminal prosecution, either as

5

falling outside of the Washington privacy act, RCW 9.73.030, or as falling within an exception noted in that statute.[3]

## ANALYSIS

### Washington privacy act, chapter 9.73 RCW

"As with all questions of law, questions of statutory interpretation are reviewed de novo." *Berrocal v. Fernandez*, 155 Wn.2d 585, 590, 121 P.3d 82 (2005); *State v. Kipp*, 179 Wn.2d 718, 726, 317 P.3d 1029 (2014). "Washington State's privacy act is considered one of the most restrictive in the nation." *Kipp*, 179 Wn.2d at 724 (citing *State v. Townsend*, 147 Wn.2d 666, 672, 57 P.3d 255 (2002)). RCW 9.73.030(1)(b) provides in relevant part:

> Except as otherwise provided in this chapter, it shall be unlawful for any individual . . . to . . . record any:
>
> . . . .
>
> [p]rivate conversation, by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation.

"Evidence obtained in violation of the act is inadmissible for any purpose at trial. RCW 9.73.050." *Kipp*, 179 Wn.2d at 724 Nevertheless, the above noted statute provides an exception. RCW 9.73.030(2) provides in relevant part, "Notwithstanding subsection (1) of this section, . . . conversations (a) of an emergency nature, . . . or (b) which convey

---

[3] Respondent's pro se briefing does not address the issue for which this court granted review. Respondent's supplemental brief focuses on a new argument, asserting that the recording was fraudulently altered, and relies on facts outside the record. As for the privacy act, respondent notes only that "[t]he debate over the minutia of the privacy act in this case is a red herring," deflecting attention from the "extensive fraud." Resp't's Br. at 14.

threats of . . . bodily harm . . . may be recorded with the consent of one party to the conversation."

Inadvertence

The trial court ruled that RCW 9.73.030(1)(b) did not apply because the recording was inadvertent and therefore outside the protection of the privacy act. The Court of Appeals held that whether Mr. Smith recorded himself "inadvertently or purposely . . . is beside the point[ because] the statute requires no specific mental state for a person to improperly record a conversation." *John Garrett Smith*, 196 Wn. App. at 237. The Court of Appeals is correct that "nothing in the plain language of RCW 9.73.030 imposes [a specific mental state]." *Id.* The Court of Appeals held that the trial court erred by concluding that Mr. Smith's inadvertence in recording the private conversation removed his actions from the reach of the privacy act. *Id.*

The State complains that by logical extension, the Court of Appeals' decision turns the privacy act into a strict liability statute and may result in absurd consequences, such as criminalizing the innocent (and common) conduct of pocket dialing.

Whenever faced with a question of statutory interpretation, we look to the plain meaning of the words used in the statute. *State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990). A nontechnical statutory term may be given its dictionary meaning; statutes should be construed to effect their purpose, and unlikely, absurd, or strained consequences should be avoided. *Id.* This court has read RCW 9.73.030 and .050 to "express[] a legislative intent to safeguard the private conversations of citizens from dissemination in any way." *Id.* at 836. In the privacy act, "[t]he legislature intended to

establish protections for individuals' privacy and to require suppression of recordings of even conversations relating to unlawful matters if the recordings were obtained in violation of the statutory requirements." *State v. Williams*, 94 Wn.2d 531, 548, 617 P.2d 1012 (1980) (citing RCW 9.73.030, .050). Accordingly, the plain language of the act confirms that even an inadvertent recording of a private conversation falls within the purview of the act.

Conversation

Next, the Court of Appeals held that "John [Smith] recorded a private conversation in violation of RCW 9.73.030." *John Garrett Smith*, 196 Wn. App. at 232. The State contends that "the recording is of [Sheryl] Smith being victimized." Suppl. Br. of Pet'r at 11. Specifically, the State asserts that the content of the recording qualifies as neither a conversation nor private. The State asserts that this case is "legally indistinguishable" from this court's prior decision in *State v. Smith*, 85 Wn.2d 840, 540 P.2d 424 (1975) (*David Smith*). Suppl. Br. of Pet'r at 10. There, a shooting victim carried an actuated tape recorder to a meeting in an alley where he suspected potential foul play. The encounter was recorded, and the recorder and recording were found on the victim's body during the autopsy. The recording included sounds of running footsteps, shouting, gunshots, some dialogue, screaming, more gunshots, silence, then an exchange about whether the victim was dead, followed by police sirens, and finally officers investigating. *David Smith*, 85 Wn.2d at 844. This court determined that the recording was admissible but limited its holding to the "bizarre facts" of the case. *Id.* at 846. This court stated:

8

We are convinced that the events here involved do not comprise "private conversation" within the meaning of the statute. Gunfire, running, shouting, and [the victim's] screams do not constitute "conversation" within that term's ordinary connotation of oral exchange, discourse, or discussion. We do not attempt a definitive construction of the term "private conversation" which would be applicable in all cases. We confine our holding to the bizarre facts of this case, and find that the tape does not fall within the statutory prohibition of RCW 9.73.030, and thus its admission is not prohibited by RCW 9.73.050.

*Id.* at 846-47.

The voice mail recording here is similar to the recording describing the shooting homicide in *David Smith*. The recording contains shouting, screaming, and other sounds, but it also contains brief oral exchanges between Mr. and Mrs. Smith in which Mr. Smith tells his wife that he is going to kill her, and she responds, "I know." CP at 78. Because the voice mail recording primarily contains the sounds of a violent assault being committed, we hold that based on *David Smith*, the content of the voice mail recording here is not of a "conversation" as contemplated by the privacy act.[4] Therefore, the

---

[4] Justice Gordon McCloud's concurrence contends that the presence of verbal exchanges in the recording at issue here distinguishes this case from *David Smith* and that we improperly "stretch[]" the analysis in the *David Smith* case by applying it here. Concurrence (Gordon McCloud, J.) at 3. But, as noted, verbal exchanges were also present in *David Smith* in the recording between the victim and the assailant, as the following passage from that case attests. This court described the content of the recording in *David Smith* as the victim, Nicholas Kyreacos, entered the alley carrying the actuated tape recorder as follows:

[S]uddenly are heard the sounds of running footsteps and shouting, the words "Hey!" and "Hold it!", Kyreacos saying "Dave Smith," and a sound resembling a gunshot. The running stops, and [defendant] Smith tells Kyreacos to turn around. Kyreacos asks, "What's the deal?" Smith replies, "You know what the deal is. I'll tell you one thing baby, you have had it."

Several more words are exchanged, not all of which are clearly intelligible .... Then Kyreacos asks, "If you wanted me, why didn't you come to see me?" Smith replies, "I'll tell you why." A moment later, another shot is heard. ... Then Kyreacos, screaming, repeatedly begs for his life. More shots are fired. There is a slight pause, two more shots are heard, then certain unclear sounds, then silence.

recording "does not fall within the statutory prohibition of RCW 9.73.030, and thus its admission is not prohibited by RCW 9.73.050." *David Smith*, 85 Wn.2d 846-47.[5]

Consent

The State also argues that the Court of Appeals erred in holding that the exception found in RCW 9.73.030(2) does not apply because "neither John nor Sheryl [Smith] consented to [the voice mail] recording." *John Garrett Smith*, 196 Wn. App. at 231 n.3. We agree with the State.

In *Townsend*, 147 Wn.2d at 676, this court held that in the context of the privacy act, a person may *impliedly* consent to the recording within the meaning of the privacy act in multiple ways. "A party is deemed to have consented to a communication being recorded when another party has announced in an effective manner that the conversation would be recorded." *Id.* at 675 (citing RCW 9.73.030(3)). Also, "a communicating party will be deemed to have consented to having his or her communication recorded when the party knows that the messages will be recorded." *Id.* at 675-76 (citing *In re Marriage of Farr*, 87 Wn. App. 177, 184, 940 P.2d 679 (1997), in which the Court of Appeals held that a party had consented to the recording of his messages when he left the message on a telephone answering machine).

In *Townsend*, police became aware of a man trying to make arrangements over the Internet for sexual liaisons with adolescent girls. Police recorded and tracked defendant's

---

*David Smith*, 85 Wn.2d at 844-45. The recording in *David Smith* and the voice mail recording here contain the sounds of a violent assault being committed. Application of *David Smith* is appropriate here.

[5] Because we hold that the content of the recording is not a "conversation," we do not reach whether that content is "private" for purposes of the privacy act, RCW 9.73.030(1)(b).

e-mail and ICQ [6] messages to a fictitious adolescent girl that police set up for the sting operation. *Id.* at 670. This court held that although defendant did not explicitly announce that he consented to the recording of his e-mail and ICQ messages to his fictitious target, his consent to such recordings could be *implied.*

> [B]ecause [defendant], as a user of e-mail had to understand that computers are, among other things, a message recording device and that his e-mail messages would be recorded on the computer of the person to whom the message was sent, he is properly deemed to have consented to the recording of those messages.

*Id.* at 676. This court noted that "the saving of messages is inherent in e-mail and ICQ messaging" and that through his use of such systems, and thus concomitant familiarity, defendant had impliedly consented to the recording of such messages. *Id.* at 678.

> [Defendant] was informed [in part] by his general understanding of ICQ technology that the recording of ICQ messages by a recipient is a possibility. Consequently, like other users of ICQ technology, he took a risk that his messages might be recorded by the recipient. [Accordingly,] under these circumstances [defendant] impliedly consented to the recording of his ICQ messages.

*Id.* at 678-79.

Similarly here, Mr. Smith, as a user of his cell phone, would be familiar with its voice mail function. His general familiarity is demonstrated by his attempt to call his cell phone in order to locate it. But by doing so, he took the risk that his call would trigger the recording (voice mail) function, and it did so. Under these circumstances, he is deemed to have consented to the voice mail recording. *Id.* at 676; *cf. Farr*, 87 Wn. App.

---

[6] ICQ is an Internet discussion software program that allows users to communicate via real time live chat by typing on the keyboard. *Townsend*, 147 Wn.2d at 670-71.

at 183 (defendant waived any statutory privacy right by leaving a message on an answering machine).

As in *Townsend*, Mr. Smith impliedly consented to the recording. Such consent triggers the threat exception to the privacy act. As noted, RCW 9.73.030(2) provides in relevant part, "Notwithstanding subsection (1) of this section, . . . conversations . . . which convey threats of . . . bodily harm . . . may be recorded with the consent of one party to the conversation." Here, Mr. Smith's threat to kill Mrs. Smith falls within this exception, and for that reason the voice mail recording was admissible at trial.

## CONCLUSION

We hold that under the facts of this case, the voice mail recording does not contain a "conversation" under *David Smith* and, thus, the voice mail recording's admission in John Garrett Smith's criminal prosecution is not prohibited by the Washington privacy act. Further, even if the voice mail recording concerned a private conversation under RCW 9.73.030(1)(b), nevertheless, because Mr. Smith impliedly consented to the voice mail recording, the threat exception provided in RCW 9.73.030(2) applies, rendering the voice mail admissible. Accordingly, we reverse the Court of Appeals to the extent it

is at odds with this disposition and reinstate John Garrett Smith's attempted second

degree murder conviction.[7]

---

[7] Shortly before consideration of this case, pro se respondent John Garrett Smith filed three motions in this court that were passed to the merits as follows: "MOTION FOR ORDER TO VOID JUDGMENT AND TO DISMISS CASE WITH PREJUDICE AND TO RELEASE FROM UNLAWFUL RESTRAINT . . . " (filed Apr. 25, 2017); "Petition for Order to IMMEDIATELY RELEASE Petitioner FROM FALSE IMPRISONMENT Unlawfully Adjudicated Under Fraudulent Absence of Jurisdiction" (filed May 16, 2017); and "Petition for Mandatory ORDER OF COMPLETE VITIATION OF CASE ON ACCOUNT OF TREASON" (filed May 22, 2017). All of respondent's motions are based on the same fundamental argument. He contends that the voice mail recording was fraudulent, faked, digitally synthesized, and/or manufactured. This argument is newly raised and based on evidence outside the record, primarily a forensic expert's analysis of the voice mail recording. This is the basis of all his other assertions. He contends that because of the fraud, any judgment is void, rendering the court(s) without jurisdiction, and all judicial officers who refuse to grant immediate vitiation of the entire case and release him are committing treason. Because his motions rely on evidence outside the record, his appropriate avenue for such arguments is a personal restraint petition. *See State v. McFarland*, 127 Wn.2d 322, 337-38, 899 P.2d 1251 (1995). In the present context, we deny all three motions.

No. 93923-3

_Madsen, J._

WE CONCUR:

_Johnson, J._      _Wiggins, J._

_Owens, J._

14

No. 93923-3

GONZÁLEZ, J. (concurring in result)—John Smith recorded himself committing a crime. He now complains that the recording violated his privacy rights. But John Smith cannot invade his own privacy. While others may object under chapter 9.73 RCW if this recording is ever used against them, John Smith cannot.

In any event, this case concerns the admissibility of evidence, not a prosecution under the privacy act. Ch. 9.73 RCW. John Smith recorded himself. He, therefore, consented to the recording at issue in this case. All members of this court agree on this point and reverse the Court of Appeals' conclusion to the contrary. John Smith set up the voice mail system, called his phone, and left a message. *Cf. In re Marriage of Farr*, 87 Wn. App. 177, 184, 940 P.2d 679 (1997) ("An answering machine's only function is to record messages."). His consent to

the recording answers a threshold question that eliminates the need to interpret the Privacy Act: Does the person who made a recording have standing to challenge the admissibility of that recording under chapter 9.73 RCW? The answer to this straightforward question is no, and we should end our review there.

"Generally, the privacy act is implicated when one party records a conversation without the other party's consent." *State v. Kipp*, 179 Wn.2d 718, 724, 317 P.3d 1029 (2014). Further, "[e]vidence *obtained* in violation of the act is inadmissible for any purpose at trial." *Id.* (citing RCW 9.73.050) (emphasis added).

Importantly, for purposes of our review, this is not a case where a third party made a recording, where John Smith's recording was intercepted,[1] or where a device not known by the defendant to make recordings did so. *See generally Kipp*, 179 Wn.2d at 723 (recording made without defendant's consent); *State v. Williams*, 94 Wn.2d 531, 617 P.2d 1012 (1980) (recording intercepted by federal agents); Br. of Amicus Wash. State Ass'n of Mun. Att'ys at 9 (describing Amazon Echo case). John Smith consented to the recording, so it was not "obtained" in violation of the privacy act. RCW 9.73.050; *see also State v. Townsend*, 147 Wn.2d 666, 675, 57

---

[1] Because the Court of Appeals concluded that the recording was made in violation of the privacy act, it declined to answer whether the recording was intercepted. *State v. Smith*, 196 Wn. App. 224, 238 n.5, 382 P.3d 721 (2016). In fact, until we took review, Smith never argued that he had unlawfully made the recording—his argument was limited to unlawful interception. *See* Clerk's Papers at 4-12; Am. Appellant's Opening Br. at 6-11.

P.3d 255 (2002) ("a communicating party will be deemed to have consented to having his or her communication recorded when the party knows that the messages will be recorded").

John Smith has no right to challenge the admissibility of a recording made in violation of the privacy act that he himself made. Ruling otherwise would have absurd results. For example, it would allow someone to take a "selfie" recording while committing a crime such as molestation or burglary and then exclude it at trial for violation of the privacy act. Therefore, in this case, it is unnecessary to determine whether the recording contained a private conversation. I concur in result.

González, J.

4

No. 93923-3

GORDON McCLOUD, J. (concurring)—I agree with the lead opinion's

conclusion that the voice mail recording was admissible against John Garrett Smith.[1]

And I agree that the portion of the recording containing screams does not constitute

a "conversation"; following our precedent, and our common sense, screams can

certainly convey important information—terror—but still do not constitute "'oral

exchange, discourse, or discussion.'" Lead opinion at 9 (quoting *State v. Smith*, 85

Wn.2d 840, 846, 540 P.2d 424 (1975) (*David T. Smith*)).

The portion of the recording containing the statement "No [w]ay . . . . I will

kill you" and related verbal statements, however, is very different. Clerk's Papers

(CP) at 78. That portion of the recording is a highly communicative and discursive

oral exchange; in fact, it constitutes an explicit verbal admission of the element of

intent to kill. It therefore constitutes "conversation" within the meaning of

---

[1] For clarity, I refer to John Garrett Smith and Sheryl Smith by their first names. Additionally, while it seems as though John Garrett Smith may also be referred to as "Garrett," *see* 2A Verbatim Report of Proceedings (RP) (Dec. 1, 2014) at 238, I will use "John." No disrespect intended.

Washington's privacy act, RCW 9.73.030. Further, under our precedent, it constitutes a conversation that we must consider "private."

As the lead opinion concludes, however, there is a statutory exception to the privacy act's rule of inadmissibility for just such explicit private threats of bodily harm. Under RCW 9.73.030(2), they are admissible with one-party consent. And John certainly consented—he initiated the recording himself by purposefully calling his cell phone and letting it ring and answer, all in an attempt to find his cell phone.

I therefore respectfully concur.

## ANALYSIS

I.    A critical portion of the recording contains a "conversation" within the meaning of the privacy act

The lead opinion states that the recording presented in this case is not a "conversation"—and therefore not covered by the privacy act—because it is legally indistinguishable from the nonconversational recording at issue in *David T. Smith*. Lead opinion at 9.

As discussed above, that is certainly true of the recorded screams in this case. As the court explained in *David T. Smith*, "Gunfire, running, shouting, and Kyreacos' *screams* do not constitute 'conversation' within that term's ordinary connotation of oral exchange . . . ." 85 Wn.2d at 846 (emphasis added).

2

But there is more to the recording in this case than just screams. As the Court

of Appeals stated, the recording in this case, unlike the recording in *David T. Smith*,

also includes "unmistakably verbal exchanges falling within the definition of

conversation." *State v. Smith*, 196 Wn. App. 224, 234, 382 P.3d 721 (2016) (*John*

*Garrett Smith*), *review granted*, 187 Wn.2d 1025, 391 P.3d 447 (2017) (citing 2A

Verbatim Report of Proceedings (RP) (Dec. 1, 2014) at 241-43). In fact, those

"verbal exchanges" contain some of the most critical inculpatory material: John's

statement "I will kill you." CP at 86 (Findings of Fact (FF) 4.1). The trial court

explicitly found that this statement showed the intent necessary for attempted murder

in the second degree.[2] *Id.* In holding that the recording is not a conversation, the

lead opinion stretches *David T. Smith* beyond its "bizarre facts" to a "conversation"

where its analysis was never intended to apply.[3]

---

[2] Specifically, the trial court referenced the following portion of the conversation:

<u>Sheryl</u>: Get away!

[<u>John</u>]: No [w]ay . . . . I will kill you.

CP at 78. As noted by the lead opinion opinion, multiple transcripts of the recording were admitted. *See* 1 RP (Nov. 24, 2014) at 70-71; CP at 78-80. Each transcript is slightly different. Lead opinion at 3 n.2.

[3] In *David T. Smith*, this court clearly made a very limited decision about what constitutes a "private conversation," stating, "We do not attempt a definitive construction of the term 'private conversation' which would be applicable in all cases. We confine our holding to the bizarre facts of this case, and find that the tape does not fall within the

3

II.   That recorded "conversation" was also "private" and, hence, is covered by the privacy act

Because the lead opinion concludes that the recording does not contain a "conversation," it declines to analyze whether any such conversation was "private" and, hence, subject to the mandates of the privacy act. RCW 9.73.030(1)(b); lead opinion at 9 n.4. Because I conclude that a critical portion of the recording was a conversation, I continue to the privacy analysis.

In *State v. Kipp*, we explained how to decide whether a conversation is "private" within the meaning of the privacy act. 179 Wn.2d 718, 317 P.3d 1029 (2014). We held, "A communication is private (1) when parties manifest a subjective intention that it be private and (2) where that expectation is reasonable."

---

statutory prohibition of RCW 9.73.030, and thus its admission is not prohibited by RCW 9.73.050." 85 Wn.2d at 846-47. Thus, this court specifically limited our holding to the "bizarre facts" present in *David T. Smith*. Broader application of *David T. Smith*, without additional inquiry, goes beyond that very limited holding.

Additionally, while there were no direct witnesses to the murder in *David T. Smith*, defendant David Smith himself acknowledged that he had shot and killed Nicholas Kyreacos. *Id.* at 843-44. The recording of the nonconversational material—specifically, the "[g]unfire, running, shouting, and Kyreacos' screams," not the "oral exchange, discourse, or discussion," *id.* at 846—was thus the critical part of that recording, because it countered David Smith's portrayal of the altercation. In this case, in contrast, John Smith has denied any physical altercation. 2C RP (Dec. 2, 2014) at 636. While there are similarities between the recordings in *David T. Smith* and *John Garrett Smith*, the "oral exchange, discourse, or discussion" presented by the recording in *John Garrett Smith* is the critical portion of the recording. Consistent with both our case law and the privacy act, I would hold that this recording must be considered a conversation.

*Id.* at 729 (citing *State v. Townsend*, 147 Wn.2d 666, 673, 57 P.3d 255 (2002)). We continued that the proof of subjective intent need not be explicit. *Id.*

The conversation between Sheryl and John was "private" under this test. With regard to the first part of the test, the subjective expectation of privacy, the facts of *Kipp* are instructive. In *Kipp*, the court determined that the defendant subjectively intended his conversation to be private because a family member left the room, "evidencing his subjective intent that the conversation be between only him and his brother-in-law." *Id.* at 730. Similarly, Skylar Williams—Sheryl's daughter, who lived with John and Sheryl—left the residence prior to the recorded conversation. CP at 84 (FF 1.4). Using the analysis employed in *Kipp*, John's subjective intention that the conversation be private can be inferred from Williams's departure, leaving John and Sheryl alone in the house.

The next question under *Kipp* and *Townsend* is whether that subjective expectation of privacy was reasonable. Under *State v. Clark*, we look at the duration and subject matter of the communication, the location of the communication and the presence or potential presence of third parties, and the role of the nonconsenting party and his or her relationship to the consenting party to evaluate whether a subjective expectation of privacy was reasonable. 129 Wn.2d 211, 225-27, 916 P.2d

5

384 (1996). This test "calls for a case-by-case consideration of all the facts." *Kipp*, 179 Wn.2d at 729 (citing *State v. Faford*, 128 Wn.2d 476, 484, 910 P.2d 447 (1996)).

In this case, all of the facts weigh in favor of reasonableness. The recording was not very long, but it included more than a "brief, routine conversation[]." *Kipp*, 179 Wn.2d at 731 (citing *Clark*, 129 Wn.2d at 231). Additionally, the subject matter included a threat to kill. As in *Kipp*, "the subject matter of the conversation in this case was not one that is normally intended to be public, demonstrating [a] reasonable expectation of privacy." *Id.* Further, John and Sheryl were alone in a private residence, a fact that weighs heavily in favor of concluding the conversation was reasonably considered private. CP at 84 (FF 1.5); *see Kipp*, 179 Wn.2d at 731. In fact, a private home is normally afforded maximum privacy expectation. *State v. Hastings*, 119 Wn.2d 229, 232, 830 P.2d 658 (1992). Finally, *Clark* requires us to look at the role of the nonconsenting party and his or her relationship to the consenting party in determining reasonableness. Here, as in *Kipp*, "[t]he parties in this case are not strangers or public officials; they are family." *Kipp*, 179 Wn.2d at 732. John and Sheryl were, in fact, married. CP at 83 (FF 1.1). That close relationship also weighs in favor of the reasonableness of the expectation of privacy.

Based on *Townsend*, *Kipp*, and *Clark*, John had both a subjective and reasonable expectation of privacy. His recorded "conversation" is therefore private and hence covered by the privacy act.

III.   John consented to the recording, triggering the privacy act's "threat" exception to inadmissibility based on one-party consent

The privacy act, however, does not protect all truly private conversations. As the lead opinion explains, RCW 9.73.030(2) states, "[C]onversations . . . which convey threats of . . . bodily harm . . . may be recorded with the consent of one party to the conversation." John's statement "I will kill you" certainly seems to be just such a threat. *Accord* lead opinion at 9-11.

The only remaining issue is whether "one party" gave "consent" to the recording. I agree with the lead opinion that the answer is yes—John did. In *Townsend*, this court held that a person may impliedly consent to a recording and analyzed the potentially consenting person's understanding of the applicable technology and knowledge that a recording might occur to determine whether such consent could be inferred. 147 Wn.2d at 678. John's general familiarity with cell phone technology and purposeful use of the home phone to locate his cell phone supports just such an inference of consent to the recording. CP at 91 (FF 2, 3). As the lead opinion explains, this implied consent triggers the threat exception to the

7

privacy act, which allows for recordings of such threats with the consent of one party to the conversation. RCW 9.73.030(2); lead opinion at 11.

John's threat to kill Sheryl falls within that exception. The recording was therefore admissible.

## CONCLUSION

John's cell phone recorded not just sounds but also a "conversation." That conversation was "private" under RCW 9.73.030(1)(b). But that private conversation also contained a "threat[] of . . . bodily harm" within the meaning of RCW 9.73.030(2). And John, who called his own cell phone on purpose with the intent to connect with that cell phone so he could find it, impliedly consented to the cell phone predictably recording any message he left. The fact that he happened to leave a message saying "I will kill you" does not change this. His threat to kill was admissible under RCW 9.73.030(2).

For these reasons, I concur.

_(signatures)_

Gordon McCloud, J.

Yu, J.

Fairhurst, C.J.

Stephens, J.

9